## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN J. INC.**, for itself and for and to the use of David Fenton, | : | **CIVIL ACTION NO. 1:14-CV-0474** |
| | : | |
| | : | **(Chief Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LANDMARK AMERICAN INSURANCE COMPANY,** | : | |
| | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff Steven J. Inc. ("Steven J.") brings an action for breach of contract against defendant Landmark American Insurance Company ("Landmark") on the ground that Landmark improperly denied a claim for certain losses sustained by property owned by Steven J. Presently before the court is Landmark's motion (Doc. 37) for summary judgment. Also pending is Landmark's motion (Doc. 44) to preclude the testimony of plaintiff's expert witness, as well as three motions (Docs. 48, 50, 51) *in limine*. For the reasons that follow, the court will grant in part Landmark's motion to preclude expert testimony and will grant its motion for summary judgment.

## I.   <u>Factual Background and Procedural History</u>[1]

This action concerns an insurance claim for damage to commercial property. The property at issue is a campground site located in Kunkletown, Pennsylvania ("the property"). (Doc. 37-5, Ex. D). The property consists of, *inter alia*, a campground, a main building with a restaurant and bedrooms ("the main building"), two additional detached buildings, a gazebo, and a pavilion. (<u>Id.</u>; Doc. 37-10, Ex. I ("Halliwell Report") at 2). Plaintiff Steven J., a Pennsylvania corporation, purchased the property in 2006 with the intention of converting it into a bed and breakfast. (Doc. 37-7, Ex. F, Sept. 19, 2014 ("Miga Dep."), at 4:24-5:17, 35:19-36:17). Steven J. owned the property at all times relevant to this action. (Doc. 37-1 ¶¶ 55-58). Steven Miga ("Miga") is the president and sole officer of Steven J. (<u>Id.</u> ¶ 16).

---

[1] The court's discussion of the factual background is primarily derived from Landmark's statement of material facts. (Doc. 37-1). Local Rule 56.1 provides that "[a] motion for summary judgment filed pursuant to FED. R. CIV. P. 56 shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1. A party opposing a motion for summary judgment shall file a separate statement of material facts, responding to the numbered paragraphs in the moving party's statement of material facts and noting genuine issues to be tried. <u>Id.</u> "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." <u>Id.</u> In the case *sub judice*, Steven J. opposes the motion for summary judgment but failed to respond to Landmark's statement of material facts in the manner prescribed by the local rules. Consequently, all material facts set forth in Landmark's statement will be deemed admitted to the extent that they are properly supported by citations to the record. <u>See</u> <u>Thomas v. United States</u>, 558 F. Supp. 2d 553, 558-59 (M.D. Pa. 2008). In resolving Landmark's motion for summary judgment, the court has independently reviewed the entire record and, as it must, will construe the evidence in the light most favorable to Steven J., the nonmoving party.

On May 23, 2012, Steven J. leased the property to David Fenton ("Fenton") for a term of two years and six months. (Doc. 37-6, Ex. E at 1).  The lease offered Fenton an option to purchase the property during the initial lease term, but Fenton never exercised this option.  (Id. ¶ 40; Doc. 37-1 ¶¶ 63-64).  Fenton submitted an application for commercial insurance as to certain buildings on the property, including the main building.  (Doc. 37-5, Ex. D).  Defendant Landmark issued Fenton d/b/a Gods Country Acres Camp Ground, Inc. a commercial property and commercial general liability policy.  (See Doc. 37-1 ¶ 45).  The policy provided coverage from August 7, 2012 to August 7, 2013.  (Id.)  With respect to the main building, the policy apparently provided coverage for "Special" causes of loss, excluding theft, under which all risks of direct physical loss were covered unless the loss was subject to an exclusion or limitation in the policy.  (See id. ¶¶ 49, 52).  Among other exclusions, the policy did not pay for loss or damage caused by wear and tear or by deterioration.  (Id. ¶ 75).  Through an endorsement, Steven J. was subsequently added to the policy as a "mortgagee."  (Id. ¶ 66).

On March 11, 2013, Fenton submitted a property loss notice.  (Id. ¶ 71).  The notice indicates that the loss occurred on February 11, 2013 and describes the damage as "eaves torn off building" and "roof leaks."  (Doc. 37-8, Ex. G).  At some point thereafter, Fenton or Steven J. apparently clarified that the damage was allegedly due to Superstorm Sandy, which affected the area on October 29, 2012. (See Halliwell Report at 1).  Landmark retained Engle Martin & Associates, Inc. ("Engle Martin"), an adjuster, to investigate Steven J.'s claim.  (Doc. 37-1 ¶ 81). Landmark authorized Engle Martin to engage Halliwell Engineering Associates,

Inc. ("Halliwell"), a third-party vendor, to analyze the claim.  (Id. ¶ 76; Doc. 42-2, Ex. A, Sept. 22, 2014 ("Keephart Dep."), at 12:21-13:9).  Engle Martin property adjuster Jonathan Keephart ("Keephart") and Halliwell engineer Mark Zajac, P.E. ("Zajac") inspected the property in April 2013.  (See Halliwell Report at 5).  On April 30, 2013, Zajac authored an engineering report regarding the cause of the claimed loss.  (See Doc. 37-1 ¶¶ 77, 80).  He opined that the roof damage and water intrusion was due to wear and tear on the roof, rather than wind damage.  (See Halliwell Report at 13-14).  In May 2013, Engle Martin issued a reservation of rights letter outlining potentially applicable policy exclusions and conditions.  (Doc. 37-1 ¶ 82; Doc. 37-17, Ex. P).

On June 18, 2013 and again several weeks later, David R. Drake, AIA, LEED AP ("Drake") inspected the property for Steven J.  (See Doc. 37-1 ¶ 31; Doc. 37-9, Ex. H, Sept. 19, 2014 ("Drake Dep."), at 12:20-13:4).  Drake prepared a report, dated August 14, 2013, in which he opined that the main building had experienced water infiltration damage and roof damage between 2012 and 2013.  (Doc. 37-18, Ex. Q ("Drake Report") at 1).  He concluded that most of the water damage in the main building was due to Superstorm Sandy or subsequent winter storms.  (Id. at 2).  At some point prior to the initiation of this action, Landmark apparently denied Steven J.'s insurance claim.[2]

---

[2] Curiously, the record does not contain documentation regarding the formal denial of Steven J.'s claim.  Neither party disputes that the claim was eventually denied.  (Doc. 18 ¶ 10; Doc. 23 ¶ 10).

Steven J. commenced the instant action in the Pennsylvania Court of Common Pleas of Monroe County against both Landmark and Engle Martin. (Doc. 1-1, Ex. A).  Defendants removed the action to this court on the basis of diversity jurisdiction. (Doc. 1).  On May 8, 2014, Steven J. filed an amended complaint. (Doc. 18).  The amended complaint states a cause of action against Landmark for breach of contract and against Engle Martin for tortious interference with the insurance contract.  Engle Martin moved to dismiss the tortious interference claim for failure to state a claim upon which relief can be granted. (Doc. 24).  In a report and recommendation, dated August 4, 2014, Chief Magistrate Judge Martin C. Carlson recommended that the court grant Engle Martin's motion.  The court adopted the report and dismissed the tortious interference claim against Engle Martin. (Doc. 35).

On October 30, 2014, after the completion of fact discovery, Landmark moved for summary judgment. (Doc. 37).  Landmark argues, *inter alia*, that the policy is void due to a misrepresentation of ownership interest, that Steven J. failed to demonstrate a covered loss, that the alleged damage was attributable to causes excluded under the policy, and that Steven J. breached the insurance contract by failing to provide timely notice of the alleged loss. (Doc. 39 at 4).  Steven J. opposed the motion. (Doc. 42-1).  Following the close of expert discovery, Landmark moved to exclude Drake's expert testimony as to causation on the grounds that Drake is not qualified to testify as an expert and that his methodology is unreliable. (Doc. 44).  Landmark also filed motions *in limine* to preclude evidence of damages, to preclude the expert testimony of Drake as to both causation and damages, and to

preclude the trial testimony of Fenton.  (Docs. 48, 50, 51).  All pending motions have been fully briefed and are ripe for disposition.

## II.   Legal Standards

### A.   Admissibility of Expert Testimony

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FED. R. CIV. P. 56(c)(2).  When there is a proper challenge to the admissibility of evidence, such as a motion to exclude expert testimony, the party offering the expert bears the burden of establishing the admissibility of such expert's testimony and report by a preponderance of the evidence.  See Burke v. TransAm Trucking, Inc., 617 F. Supp. 2d 327, 331 (M.D. Pa. 2009); see also In re Paoli R.R. Yard PCB Litig. (Paoli II), 35 F.3d 717, 744-46 (3d Cir. 1994).

Admissibility of expert testimony is a question of law governed by Federal Rule of Evidence 702.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-89 (1993).  Trial courts must act as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is . . . reliable."  Id. at 589.  Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  The United States Court of Appeals for the Third Circuit has

explained that Rule 702 sets forth three separate restrictions on the admission of

expert testimony: qualification, reliability, and fit.  Schneider _ex rel._ Estate of

Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  Rule 702 embraces a "liberal

policy of admissibility."  Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008)

(quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).

### B.    Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate

when "there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A factual dispute is

"material" if it might affect the outcome of the action under applicable law, and is

"genuine" only if there is a sufficient evidentiary basis that would allow a

reasonable factfinder to return a verdict for the nonmoving party.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  The burden of proof is on the

nonmoving party to come forth with "affirmative evidence, beyond the allegations

of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F.

Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317,

322-23 (1986).  "Such affirmative evidence—regardless of whether it is direct or

circumstantial—must amount to more than a scintilla, but may amount to less (in

the evaluation of the court) than a preponderance."  Saldana v. Kmart Corp., 260

F.3d 228, 232 (3d Cir. 2001) (quoting Williams v. Borough of W. Chester, 891 F.2d

458, 460-61 (3d Cir. 1989)). This evidence must be adequate, as a matter of law, to

sustain a judgment in favor of the nonmoving party on the claims.  See Anderson,

477 U.S. at 250-57; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986); <u>see</u> <u>also</u> FED. R. CIV. P. 56(a), (c), (e).  Only if this threshold is met may the cause of action proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

**III.**   <u>**Discussion**</u>[3]

As a threshold matter, the court will analyze the admissibility of Drake's expert testimony and, thereafter, address Landmark's motion for summary judgment.  <u>See</u> <u>Woolums v. Nat'l RV</u>, 530 F. Supp. 2d 691, 704 (M.D. Pa. 2008) (noting that the admissibility of expert testimony may be challenged at summary judgment).

**A.   Landmark's Motion to Preclude Drake's Testimony**

Steven J. has identified Drake as an expert witness.  (Doc. 51-4, Ex. C). Landmark contends that Drake's testimony is inadmissible under Federal Rule of Evidence 702 and <u>Daubert</u>.  Specifically, Landmark argues that Drake lacks the requisite qualifications to testify about the cause of the alleged damage and that Drake did not employ reliable methodology.  (Doc. 45 at 6-11).  Assuming *arguendo*

---

[3] Jurisdiction over the instant action is based on diversity of citizenship, <u>see</u> 28 U.S.C. § 1332(a); 28 U.S.C. § 1441, which in this case requires the court to apply Pennsylvania law to Steven J.'s breach of contract claim.  <u>See</u> <u>Norfolk S. Ry. Co. v. Basell USA Inc.</u>, 512 F.3d 86, 91-92 (3d Cir. 2008); <u>see</u> <u>also</u> <u>Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.</u>, 458 F.3d 159, 163 (3d Cir. 2006) (noting that an insurance contract is governed by the law of the state in which the contract was formed).  Neither party disputes the application of Pennsylvania law to this matter. (Doc. 39 at 5).

that Drake is sufficiently qualified to opine on the cause of the damage,[4] the court

will proceed to consider the reliability of Drake's opinion.[5]

When a party challenges the admissibility of an expert's testimony, a trial

court must assess whether the testimony has "a reliable basis in the knowledge and

experience of [the relevant] discipline." Kumho Tire Co. v. Carmichael, 526 U.S.

137, 147 (1999) (alteration in original) (quoting Daubert, 509 U.S. at 592).  The

reliability inquiry under Rule 702 focuses on the soundness of the expert's

methodology and technique rather than on the expert's conclusions.  Pineda, 520

F.3d at 247; Paoli II, 35 F.3d at 742.  The touchstone of this inquiry is whether the

expert's methodology is "sufficiently reliable so that it will aid the jury in reaching

accurate results." Paoli II, 35 F.3d at 744 (citation omitted).  A court need not admit

expert testimony that is based on the *ipse dixit* of the expert.  Gen. Elec. Co. v.

Joiner, 522 U.S. 136, 146 (1997).  The proponent of the expert testimony must show

---

[4] The court notes that Steven J. did not submit a *curriculum vitae* or other documentation detailing Drake's qualifications.  During his deposition, however, Drake testified that he is an architect with over forty years of experience in his field. (Drake Dep. at 5:17-8:6).

[5] The court will not hold a Daubert hearing in connection with Landmark's motion to exclude Drake's testimony.  The decision whether to hold a Daubert hearing lies within the "sound discretion" of the district court.  Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999).  In the instant matter, the court has before it a sufficient factual record on which to assess the reliability of Drake's methodology, including Drake's expert report and a complete transcript of his deposition.  See Oddi v. Ford Motor Co., 234 F.3d 136, 154-55 (3d Cir. 2000) (upholding district court's decision to deny a Daubert hearing when the record contained the depositions and affidavits of plaintiff's experts and when an expert sufficiently explicated the basis for his conclusions); Pease v. Lycoming Engines, No. 4:10-CV-00843, 2011 WL 6339833, at *4 n.5 (M.D. Pa. Dec. 19, 2011) (declining to hold a Daubert hearing when the factual record permitted reliability determinations and when the experts explained their methodology in deposition testimony).

by a preponderance of the evidence that the expert's testimony is based on "good grounds." Kannankeril, 128 F.3d at 807.  This standard requires more than a *prima facie* showing of reliability, but it is less onerous than the merits standard of correctness.  Pineda, 520 F.3d at 247 (quoting Paoli II, 35 F.3d at 744).  The Supreme Court has held that trial courts' "gatekeeping" obligations extend to both scientific and nonscientific expert testimony.  Kumho Tire Co., 526 U.S. at 147.

Several factors outlined in Daubert guide the court's evaluation of the reliability of expert testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, 520 F.3d at 247-48 (citing Paoli II, 35 F.3d at 742 n.8).  These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  Kumho Tire Co., 526 U.S. at 150 (citation omitted); accord Kannankeril, 128 F.3d at 806-07 ("[T]hese factors are neither exhaustive nor applicable in every case.").  The reliability inquiry under Rule 702 is flexible and must be tied to the facts of each action.  Kumho Tire Co., 526 U.S. at 150 (quoting Daubert, 509 U.S. at 591).

In the instant case, Drake authored a report in which he opined that the main building experienced extensive water infiltration damage during the fall and winter months of 2012 to 2013.  (Drake Report at 1).  He explained that "it ha[d] been

reported" to him that Superstorm Sandy caused roof damage that resulted in this water intrusion.  (<u>Id.</u>)  Drake noted that the roofing materials include both asphalt shingles and torched-down rubber.  (<u>Id.</u>)  According to Drake, wind from Superstorm Sandy "apparently" damaged some asphalt shingles and joints on the rubber area, which facilitated water entry.  (<u>Id.</u>)  Drake also found significant tree damage above the property, which he attributed to Superstorm Sandy, and noted that on November 23, 2012 he observed extensive tree "blow over" on the nearby property of a family member.  (<u>Id.</u>)  This tree damage, according to Drake, evidences the strength of the storm's winds.  (<u>Id.</u>)  Based on these observations and his review of inventory photographs from May 2012, which purportedly revealed no water damage, Drake concluded that "most, if not all, of the water damage on the main level of the 'lodge' was a result of roof damage from Hurricane Sandy and possibly even later winter storms."  (<u>Id.</u> at 1-2).

In certain circumstances, admissible expert testimony may derive from an expert's knowledge and experience.  <u>Oddi</u>, 234 F.3d at 158.  When such testimony is based on knowledge and experience, the expert must nevertheless establish that his methodology is reliable.  <u>Pappas v. Sony Elecs., Inc.</u>, 136 F. Supp. 2d 413, 425 n.16 (W.D. Pa. 2000).  Drake's report fails in this respect.  The report concludes that winds from Superstorm Sandy or subsequent winter storms damaged the roof of the main building but does not articulate a sufficient methodological or factual basis for this conclusion.  Drake does not, for example, explain what led him to conclude that the damage to the roofing materials resulted from wind rather than from other proposed sources of damage, such as wear and tear and deterioration.  <u>Cf.</u> <u>Hayden</u>

v. Westfield Ins. Co., No. 12-0390, 2013 WL 5781121, at *8 (W.D. Pa. Oct. 25, 2013)

(criticizing expert report for failing to consider other damage-causing factors), aff'd

on other grounds, 586 F. App'x 835 (3d Cir. 2014).[6]  Drake's averment that winds

from Superstorm Sandy "apparently" damaged the roof is tenuous and speculative.

Indeed, Drake's report offers little more than the mere possibility that Superstorm

Sandy caused damage to the roof.  See Oddi, 234 F.3d at 158 (stating that an

expert's opinion must be based on more than subjective believe or unsupported

speculation (quoting Paoli II, 35 F.3d at 742)); Kemmerer v. State Farm Ins. Co., No.

01-5445, 2004 WL 87017, at *3 (E.D. Pa. Jan. 19, 2004) (noting that an expert's

opinion is inadmissible when it expresses only possibilities).[7]

Drake's deposition testimony confirms that his methodology falls far short of

the required quantum of reliability.  Drake testified that he relied on Miga's and

Fenton's representations that Superstorm Sandy caused the roof damage and that

he was unable to verify these representations.  (See Drake Dep. at 20:24-21:18).  In

preparing his report, Drake did not, for example, review weather reports, rain

---

[6] This omission is noteworthy given that Drake acknowledged during his deposition that an asphalt shingle roof typically lasts twenty to thirty years—the approximate age of the shingle roof where the damage occurred.  (Drake Dep. at 26:19-27:1).

[7] Drake's observation of tree "blow over" on Steven J.'s property and on a nearby property does not cure the deficiencies in his methodology.  First, Drake does not establish that the tree damage on Steven J.'s property occurred within the coverage period.  He testified that he did not know whether the tree damage resulted from Superstorm Sandy or from earlier events.  (Id. at 24:12-20).  Second, Drake does not claim that any trees directly damaged the main building.  According to Drake, the trees that blew over on the property were located "a few hundred" feet away from the main building.  (Id. at 28:18-29:2).  Finally, Drake fails to explain, beyond pure speculation, any correlation between the tree "blow over" and a storm event sufficient to damage the roofing materials at issue here.

gauges, or any other technical documents.  (Id. at 15:23-16:10).[8]  Drake affirmed that

his own conclusion on causation was predicated on what Miga and Fenton informed

him about the cause of the damage:

> Q: Okay.  You indicate in your report that the water damage was a
> result of roof damage from Sandy.  I'd like to know how you came to
> that conclusion.
>
> A: Well, if there was not damage before Sandy or not significant
> damage before Sandy and it was related to me that the damage was
> caused by Sandy, then that was my conclusion.
>
> Q: So you have no independent evaluation.  It was just based on what
> was reported to you, is that correct?
>
> A: Yes.  Because I did not—there was some—obviously there was some
> time between the storm and the time I was on the site, and I had not
> seen the building previously.

(Id. at 20:24-21:9, 31:17-32:6).[9]  Moreover, Drake acknowledged that he was unable to

ascertain how much damage resulted from Superstorm Sandy as opposed to

subsequent storms (Drake Dep. at 29:10-25), further undercutting his attribution of

roof damage to Superstorm Sandy.  Culled to its essence, Drake's approach is

---

[8] The court does not suggest that consideration of each of these sources is necessary to proffer a reliable expert opinion on whether a storm event resulted in damage to a structure.

[9] Federal Rule of Evidence 703 permits experts to rely on inadmissible hearsay evidence to the extent that experts in that field "would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  FED. R. EVID. 703. Steven J. has not demonstrated that it was reasonable for Drake to rely on Miga's and Fenton's bare representations about the cause of the damage.  See Buzzerd v. Flagship Carwash of Port St. Lucie, Inc., 669 F. Supp. 2d 514, 527-28 (M.D. Pa. 2009) (finding an industrial hygienist's opinion regarding the cause of plaintiffs' health conditions unreliable when the expert relied on plaintiffs' hearsay statements about their symptoms), aff'd, 397 F. App'x 797 (3d Cir. 2010); see also Crowley v. Chait, 322 F. Supp. 2d 530, 553 (D.N.J. 2004) ("[A]n expert may not be used simply as a vehicle for the admission into evidence of otherwise inadmissible hearsay testimony.").

nothing more than an "educated guess," wholly untestable.  Most assuredly, it is not based on reliable principles and methods.  <u>See</u> FED. R. EVID. 702.

The court concludes that Steven J. has not shown that Drake has "good grounds" for his testimony.  Drake inspected the property, but his opinion on causation is based primarily on information provided by Miga and Fenton.  <u>Cf.</u> <u>Hayden</u>, 2013 WL 5781121, at *7 (noting that plaintiffs' expert impermissibly relied on what plaintiffs informed him about the cause of water infiltration).  Drake's testimony will not assist a jury in accurately evaluating the cause of the damage. <u>See</u> <u>Paoli II</u>, 35 F.3d at 744.  Accordingly, the court will exclude Drake's testimony to the extent that Drake opines on the cause of the damage to the property.

**B.      Landmark's Motion for Summary Judgment**[10]

Steven J. alleges that Landmark breached the parties' insurance contract by failing to cover the loss to the property.  (See Doc. 18 ¶¶ 17-20).  To establish a claim for breach of contract under Pennsylvania law, the plaintiff must demonstrate (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.  CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).  Under Pennsylvania law, the proper construction of an insurance contract is generally a matter of law that the

---

[10] In affidavits accompanying Steven J.'s opposition to Landmark's motion for summary judgment, Miga and Steven J. records custodian Jeanne Amodeo ("Amodeo") aver that they have not been provided an opportunity to read or sign their deposition transcripts and object to the use of their deposition testimony in support of Landmark's motion.  (Doc. 42-5, Ex. D ¶ 4; Doc. 42-6, Ex. E ¶ 20).  Federal Rule of Civil Procedure 30(e) provides that on a request by a deponent or party before the completion of a deposition, the deponent must be afforded thirty days after notification of transcript availability in which to review the transcript and make any changes.  FED. R. CIV. P. 30(e).  In the instant matter, counsel for Steven J. requested that Miga and Amodeo read and sign their depositions.  (Miga Dep. at 4:11-13; Doc. 37-14, Ex. M, Sept. 19, 2014 ("Amodeo Dep."), at 4:10-12).  The record does not reveal when Miga and Amodeo received notification that their transcripts were available for review.  Assuming *arguendo* that they were not notified until October 30, 2014, the date on which Landmark moved for summary judgment, Steven J. offers no indication that the deponents attempted to review the transcripts or submit changes within thirty days of that date.  Neither Steven J. nor the deponents assert that the transcripts contain any inaccuracies or explain how prejudice would result from consideration of the transcripts at this juncture.  See Cohen's Fashion Optical, Inc. v. Cohen, No. 94-297, 1996 WL 1493026, at *9 (W.D. Pa. Sept. 30, 1996) (declining to disregard defendant's summary judgment submissions when plaintiff failed to show any errors in the transcript or prejudice from its use).  Additionally, Steven J. has not moved to suppress the transcripts in a timely fashion.  See FED. R. CIV. P. 32(d)(4) (providing that any objections to the manner in which the officer transcribed or otherwise processed the testimony are waived "unless a motion to suppress is made promptly after the error or irregularity becomes known or, with reasonable diligence, could have been known").  Hence, the court will consider Miga's and Amodeo's deposition transcripts in connection with Landmark's motion for summary judgment.

court may resolve at summary judgment.  <u>Bishops, Inc. v. Penn Nat'l Ins.</u>, 984 A.2d 982, 989 (Pa. Super. Ct. 2009) (quoting <u>Nationwide Mut. Ins. Co. v. Nixon</u>, 682 A.2d 1310, 1313 (Pa. Super. Ct. 1996)).  An insurance policy must be read as a whole and construed in a manner to give effect to all provisions therein.  <u>Piechota v. Hartford Fire Ins. Co.</u>, No. 11-7188, 2013 WL 271809, at *1 (E.D. Pa. Jan. 23, 2013) (citations omitted).  When a policy provision is ambiguous, the court must construe that provision in favor of the insured and against the insurer.  <u>Standard Venetian Blind Co. v. Am. Empire Ins. Co.</u>, 469 A.2d 563, 566 (Pa. 1983).  Unambiguous language in the policy, however, must be accorded its "plain and ordinary meaning."  <u>Piechota</u>, 2013 WL 271809, at *1 (citations omitted).

Steven J. does not claim that any structures on the property sustained a loss other than the main building.[11]  Viewing the evidence in the light most favorable to Steven J., the policy provides coverage for "Special" causes of loss to the main building.  (Doc. 37-4, Ex. C at 14).  Covered causes of loss in the "Special Form" section of the policy refer to "Risks Of Direct Physical Loss" unless the loss is excluded or limited as provided in that section.  (<u>Id.</u> at 48).  As to the main building, therefore, the court construes the insurance policy as an "all risk" policy.  An "all risk" policy covers all insurable losses except those that are specifically excluded.  <u>Betz v. Erie Ins. Exch.</u>, 957 A.2d 1244, 1255-56 (Pa. Super. Ct. 2008) (quoting BLACK'S LAW DICTIONARY 815 (8th ed. 2004)).  Under an "all risk" policy, the insured bears the initial burden of demonstrating that a loss occurred.  <u>Wexler Knitting</u>

---

[11] Drake observed damage only to the main building.  (Doc. 37-1 ¶ 36).

Mills v. Atl. Mut. Ins. Co., 555 A.2d 903, 905 (Pa. Super. Ct. 1989).  The insured must

establish that this loss was sustained during the period of coverage.  See Riehl v.

Travelers Ins. Co., 772 F.2d 19, 23 (3d Cir. 1985).  The burden of proof thereafter

shifts to the insurer to show that the loss falls within an exclusion to the policy.

Wexler Knitting Mills, 555 A.2d at 905.

Landmark first contends that that Steven J. has not met its burden of

demonstrating that a covered loss occurred.  (Doc. 39 at 8).  According to Landmark,

Steven J. failed to present evidence that the damage to the main building resulted

from Superstorm Sandy.  (Id.)[12]  Landmark further argues that neither Miga nor

Amodeo possesses knowledge about the cause of the loss and that Drake's

testimony is insufficient to establish causation.  (Id. at 9-11).

To recover under an insurance contract, the insured must show that its claim

falls within the scope of the policy's coverage.  See Warner v. Employers' Liab.

Assurance Corp., 133 A.2d 231, 233 (Pa. 1957).  This showing is not difficult in the

context of an "all risk" policy.  See Miller v. Bos. Ins. Co., 218 A.2d 275, 279 (Pa.

1966) ("It would seem that all plaintiff need show in [an "all risk"] case is a loss,

since losses from all causes are covered."); Betz, 957 A.2d at 1256-57 ("So long as

reasonable people could conclude that the claimed loss is covered by language

anywhere in the policy . . . , the insured has carried his burden as concerns an 'all-

_____

[12] In support of this argument, Landmark cites the property loss notice that
Fenton submitted on March 11, 2013, which indicates that the loss occurred in
February 2013 rather than in October 2012.  (Doc. 39 at 8).  This document does not
foreclose Steven J.'s position that Superstorm Sandy caused the claimed loss.  As
implied by the Halliwell report, Steven J. or Fenton subsequently clarified that the
purported date of loss was October 29, 2012.  (See Halliwell Report at 1).

17

risks' policy."). In the instant matter, the policy covers all "risks of direct physical loss" to the main building, subject to certain exclusions and limitations. (Doc. 37-4, Ex. C at 48). The record reveals that the main building sustained a physical loss. The Halliwell report details damage to the roof and significant water intrusion. (Halliwell Report at 5-7).

The court finds that there is a genuine issue of fact regarding whether the damage occurred within the coverage period. Steven J. submitted an underwriting report based on an August 15, 2012 inspection of the property by Site Inspections, LLC. (Doc. 42-4, Ex. C). That report suggests that there was no evidence of water damage at the time of the inspection, which occurred after the effective date of the policy. (See id. at 3).[13] The burden therefore shifts to Landmark to establish that an exclusion to coverage applies.

Landmark contends that several exclusions bar coverage for Steven J.'s claim. Among other exclusions, Landmark cites a provision for "[w]ear and tear." (Doc. 39 at 11-13).[14] The court finds support for Landmark's position in the

---

[13] Steven J. argues that photographs of the property allegedly taken in May 2012 exhibit that the property was in good condition prior to the purported date of loss. (Doc. 42-1 at 3). The court agrees with Keephart that the poor quality of the photographs precludes any accurate assessment of the condition of the premises as of May 2012. (See Keephart Dep. at 9:16-10:25). Construing the record in favor of Steven J., the court will assume for the purpose of this memorandum that the photographs do not evidence water damage.

[14] Black's Law Dictionary defines "wear and tear" as "[d]eterioration caused by ordinary use; the depreciation of property resulting from its reasonable use." BLACK'S LAW DICTIONARY 1827 (10th ed. 2014); see also MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1417 (11th ed. 2005) (defining "wear and tear" as "the loss, injury, or stress to which something is subjected by or in the course of use; *esp* : normal depreciation").

Halliwell report.  In preparing the report, Zajac reviewed aerial photographs of the property from May 2012, evaluated weather data from a nearby site, and inspected the damage to the main building.  (Halliwell Report at 1-2).  With respect to the exterior of the main building, Zajac observed, *inter alia*, "[v]arious ages" of sealant repairs to the asphaltic roof, alligator cracks in the sealant, buckling and cracked shingles, vegetative growth and organic debris at multiple locations on the roof, blistering and seam separation of roofing materials on the southeast section of the roof, and damage to portions of two gutters and a soffit.  (Id. at 5-6).  In the interior of the building, Zajac found evidence of water intrusion damage, water stains, apparent microbial growth, and rust corrosion at multiple locations.  (Id. at 6-7).  Drawing on meteorological data from an official weather station twelve miles south of the property, Zajac estimated that the maximum sustained wind speeds at the property on October 29, 2012 were 53 miles per hour, with maximum 5-second wind gusts of 70 miles per hour.  (Id. at 7-8, 13).  These speeds, Zajac noted, are lower than those found in a Category 1 hurricane, which is characterized by sustained winds of 74 to 95 miles per hour.  (Id. at 8).[15]

Zajac concluded that the damage to the main building was most likely due to a roof that had outlived its service life.  (Id. at 14).  The buckling and cracking asphaltic shingles, according to Zajac, were all signs of an aged roof exposed to

_____

[15] The court interprets the Halliwell report as opining that wind speeds of 53 miles per hour and wind gusts of 70 miles per hour are unlikely to result in *major* structural damage, not that such speeds are necessarily incapable of causing *any* damage to buildings such as the one at issue in this action.  (See Halliwell Report at 13).  To the extent that the report concludes otherwise, the court need not and does not endorse that conclusion for the purpose of this memorandum.

moisture intrusion, while the alligator cracks resulted from age-related deterioration of the sealant.  (Id.)  Zajac further opined that vegetative growth on the roof facilitated additional water intrusion.  (Id.)  Finally, he attributed the damage to the gutters and soffit to accumulated organic debris and tree branches.  (Id.)  Importantly, Zajac found no evidence of wind damage to the main building.  (Id.)

Other record evidence supports Zajac's conclusion that the roof had outlived its service life.  Drake testified that the average lifespan of an asphalt roof is twenty to thirty years, while the roof of the main building was approximately twenty to twenty-five years old.  (Doc. 37-1 ¶ 79).  The underwriting report indicates that the roof was thirty years old and in "average" condition.  (Doc. 42-4, Ex. C at 4).  The record also suggests that repairs had been made to the roof prior to Superstorm Sandy.  Zajac saw evidence of roof repairs in aerial photographs from May 2012 (Halliwell Report at 14), and Keephart reviewed historical roof repairs based on aerial imagery (Keephart Dep. at 19:19-20:5).  Furthermore, Drake testified that Miga informed him that the roof had experienced leakage prior to October 2012, which necessitated sealant repairs.  (Drake Dep. at 27:7-28:7).

Steven J. has failed to adduce evidence from which a reasonable juror could conclude that the wear and tear exclusion does not bar coverage.  Steven J. does not contend that the wear and tear exclusion is ambiguous such that it must be construed other than according to its ordinary meaning.  It has not disputed that the roof was aging or that it had previously received repairs.  And it does not contest the admissibility of the Halliwell report or offer any admissible theories of

causation that properly challenge the conclusions of that report.  Cf. Gold v. State Farm Fire & Cas. Co., 880 F. Supp. 2d 587, 595-97 (E.D. Pa. 2012) (concluding that, under an "all risk" policy, defendant presented sufficient evidence that damage to plaintiffs' home was subject to an exclusion for surface or subsurface water when plaintiffs and their expert failed to raise a triable issue regarding the cause of the damage).[16]  Rather than pointing to affirmative evidence, Steven J.'s opposition to Landmark's motion for summary judgment consists in relevant part of a series of questions about what caused the damage.  (Doc 42-1 at 8).[17]  Fenton, who resided on the property during the relevant coverage period, did not appear for his noticed deposition.  (See Doc. 37-1 ¶¶ 25-26).[18]

Neither Amodeo's nor Miga's testimony creates a genuine issue of material fact regarding whether the damage is subject to an exclusion for wear and tear. Amodeo explained that she had not visited the property and that she did not communicate with Fenton about any damage from Superstorm Sandy.  (Amodeo

---

[16] As the court determined *supra*, Drake's testimony with respect to causation is inadmissible under Federal Rule of Evidence 702 and Daubert.

[17] Steven J. argues elsewhere in its opposition brief that Engle Martin improperly withheld from Landmark the May 2012 photographs of the premises and that Landmark improperly withheld from Engle Martin the August 2012 underwriting report.  (Doc 42-1 at 3).  The court has construed both documents in the light most favorable to Steven J. but nevertheless finds that their belated consideration does not undermine the conclusions of the Halliwell report or create a genuine issue of material fact regarding the applicability of policy exclusions.

[18] Steven J.'s counsel accepted the deposition notice for Fenton.  (Doc. 51 ¶ 6; Doc. 58 ¶ 6).  Steven J. does not move for additional discovery or otherwise contend that Fenton's deposition is essential to its summary judgment opposition.  See FED. R. CIV. P. 56(d) (permitting a court to extend the time for discovery, *inter alia*, when the nonmoving party demonstrates that "it cannot present facts essential to justify its opposition").

Dep. at 21:4-10).  Miga acknowledged that, prior to the storm, he had not visited the property since he leased the premises to Fenton in May 2012.  (See Miga Dep. at 45:23-46:24).  Miga testified that at some point after the storm, he went to the property to speak with Fenton and observed damage.  (Id. at 58:19-59:11 ("There was some [damage], you know, from the storm and stuff.")).  He clarified in a subsequent affidavit that he visited the property in early November 2012.  (Doc. 42-6, Ex. E ¶ 8).  According to Miga, he "noticed that the premises had sustained substantial wind and water damage."  (Id. ¶ 9).  Miga's averments are not sufficiently probative of causation.  Indeed, he offers no analysis of his investigation or specific facts for his opinion that Superstorm Sandy damaged the property, and his statement that Drake "correctly concluded that the storm caused the damage" is merely conclusory.  See Coleman v. Cerski, No. 3:04-CV-1423, 2007 WL 2908266, at *4 (M.D. Pa. Oct. 4, 2007) (noting that affidavits submitted in connection with a motion for summary judgment that are conclusory and lacking in specific facts may be disregarded (citing Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1144 (3d Cir. 1990))); cf. Weinberg v. Nationwidecasualty & Ins. Co., 949 F. Supp. 2d 588, 593-95 (E.D. Pa. 2013) (finding that a loss to the exterior of plaintiff's home was subject to an exclusion for deterioration when the home sustained damage prior to a windstorm and exhibited extensive water infiltration, and noting that plaintiff's "bare assertion" that the windstorm caused the deterioration did not create a genuine issue).

The court holds that Landmark has met its burden of establishing that the wear and tear provision of the insurance policy excludes coverage for the claimed

loss.  On the record before it, the court is compelled to grant Landmark's motion for summary judgment.[19]

**IV.**   **Conclusion**

For all of the foregoing reasons, the court will grant in part Landmark's motion to preclude the expert testimony of Drake, grant Landmark's motion for summary judgment, and deny as moot Landmark's three motions *in limine*.  An appropriate order will issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:       June 22, 2015

---

[19] In light of this holding, the court need not consider the applicability of other proposed exclusions or reach Landmark's additional arguments that the insurance policy is void due to a misrepresentation of ownership interest or that Steven J. failed to provide timely notice of its claim.